[Cite as *State v. Honeycutt*, 2014-Ohio-352.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | CASE NO.   CA2013-02-018 |
| | : | O P I N I O N |
| - vs - | | 2/3/2014 |
| | : | |
| ALLEN D. HONEYCUTT, | : | |
| Defendant-Appellant. | : | |

CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 12CR28433

David P. Fornshell, Warren County Prosecuting Attorney, Michael Greer, 500 Justice Drive, Lebanon, Ohio 45036, for plaintiff-appellee

Arenstein & Gallagher, William R. Gallagher, Elizabeth Conkin, The Citadel, 114 East Eighth Street, Cincinnati, Ohio 45202, for defendant-appellant

**HENDRICKSON, P.J.**

{¶ 1}   Defendant-appellant, Allen D. Honeycutt, appeals from a judgment rendered by the Warren County Court of Common Pleas sentencing him to eight years in prison after a jury found him guilty of various offenses relating to the growth, possession, and trafficking of marijuana.  For the reasons discussed below, judgment is reversed, Honeycutt's convictions are vacated, and Honeycutt is discharged.

## I. FACTUAL BACKGROUND

**{¶ 2}** At the outset, we note that the facts in this case are substantially similar to the facts set forth in *State v. Baker*, 12th Dist. Warren No. CA2012-12-127, 2013-Ohio-2398 (hereafter, *Baker I*).

**{¶ 3}** In August 2011, the Warren County Drug Task Force (WCDTF) began investigating Tyler Pagenstecher on suspicion of drug trafficking. The police discovered that Pagenstecher, a juvenile at the time of the initial police investigation, was selling marijuana to other juveniles in the Mason, Warren County, Ohio area. Officers determined that Pagenstecher's supplier was Michael Lopez. Lopez in turn purchased his marijuana from a married couple, Cody and Stacy Lampe. The Lampes grew their own marijuana for distribution in Norwood, Hamilton County, Ohio, and they also purchased marijuana from Justin Baker. Baker operated multiple grow operations, including a "grow house" on Noble Avenue in Hamilton, Butler County, Ohio and a "warehouse grow" on Creek Road in Blue Ash, Hamilton County, Ohio. The Creek Road warehouse was leased in Honeycutt's name and contained over 380 marijuana plants.

**{¶ 4}** In January 2012, Pagenstecher was apprehended by the WCDTF after he made a number of marijuana sales to an undercover officer. Pagenstecher agreed to assist the task force by arranging a buy from Lopez of his usual purchase of four ounces of marijuana. On January 13, 2012, Pagenstecher, at the request of the task force, told Lopez to meet him at a Walmart in Warren County, Ohio. Members of task force were waiting for Lopez, and he was immediately apprehended. Lopez agreed to assist the task force, and on February 1, 2012, Lopez arranged a buy from the Lampes. Lopez went to the Lampes' home in Hamilton County, Ohio and purchased one pound of marijuana. The Lampes were subsequently detained by the WCDTF.

**{¶ 5}** The Lampes also agreed to assist the task force. Cody Lampe agreed to wear

a wire to allow the task force to listen in on a conversation he had with Baker, wherein the two discussed the cultivation of marijuana and Cody Lampe's previous purchases from Baker. The conversation took place at a bar located in Butler County, Ohio. Following his conversation with Cody Lampe, Baker left the bar and traveled to the Creek Road warehouse in Hamilton County, Ohio. Members of the WCDTF followed Baker and observed him enter the warehouse. The warehouse was subsequently placed under surveillance. A short time later, a warrant to search the warehouse was issued.

{¶ 6} On February 17, 2012, the warrant was executed on the warehouse. Officers recovered 38,000 grams of marijuana and numerous tools used in the cultivation of marijuana from the warehouse, including digital scales, clay pellets, tanks of carbon dioxide, carbon filters, ventilation equipment, five-gallon buckets, and high-powered lights with separate ballasts. While executing the warrant, officers encountered Honeycutt on the premises. Honeycutt was standing inside the locked gate to the warehouse. In his possession were keys that opened not only the gate to the entrance of the warehouse, but also the doors to the building where the marijuana was being grown. Inside Honeycutt's truck, which was parked near the entrance of the building, officer's found a small amount of marijuana, receipts to Home Depot and Dayton Hydroponics stores, a drug ledger detailing two separate drug harvests and the amount collected from such harvests, and the lease, rent receipts, and water and electricity bills for the warehouse.

{¶ 7} Honeycutt was arrested and indicted on one count of trafficking in marijuana, one count of possession of marijuana, one count of cultivation of marijuana, one count of possession of criminal tools, and one count of engaging in a pattern of corrupt activity. Following a four-day jury trial held in January 2013, Honeycutt was convicted on all counts and was sentenced to eight years in prison.

{¶ 8} Honeycutt now appeals, setting forth four assignments of error. For ease of

discussion, we will address Honeycutt's first and fourth assignments of error together.

## II. ANALYSIS

{¶ 9} Assignment of Error No. 1:

{¶ 10} THE EVIDENCE IS INSUFFICIENT TO ESTABLISH VENUE IN WARREN COUNTY BEYOND A REASONABLE DOUBT.

{¶ 11} Assignment of Error No. 4:

{¶ 12} THE TRIAL COURT ERRED BY REFUSING TO APPLY LAW EMPLOYED BY [THE] MAJORITY OF OHIO APPELLATE DISTRICTS.

{¶ 13} Honeycutt argues the state failed to prove that venue was proper in Warren County, Ohio. Honeycutt contends the record "shows conclusively [that] Warren County was not the proper venue in which to bring charges against [him] as he did not cultivate, traffic, or possess marijuana there, nor did he possess criminal tools or engage in a pattern of corrupt activity in Warren County." Honeycutt further asserts that the state failed to prove he knew of, conspired with, or had any associate of his engage in conduct involving an enterprise in Warren County.

{¶ 14} A criminal defendant is entitled to "a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed." Ohio Constitution, Article I, Section 10. "Section 10, Article I of the Ohio Constitution fixes venue, or the proper place to try a criminal matter * * *." *State v. Hampton*, 134 Ohio St.3d 447, 2012-Ohio-5688, ¶ 19, citing *State v. Headley*, 6 Ohio St.3d 475, 477 (1983). "Establishing the correct venue is imperative in order to 'give the defendant the right to be tried in the *vicinity* of his alleged criminal activity.'" (Emphasis sic.) *Baker I,* 2013-Ohio-2398 at ¶ 11, quoting *State v. Meridy*, 12th Dist. Clermont No. CA2003-11-091, 2005-Ohio-241, ¶ 12. Proper venue ensures that "the state [does not] indiscriminately [seek] a favorable location for trial or [select] a site that might be an inconvenience or disadvantage for the defendant." *Meridy* at ¶ 12.

- 4 -

{¶ 15} "While venue is not a material element of any offense charged, the state must nonetheless prove beyond a reasonable doubt that the crime charged was committed in the county where the indictment was returned and the trial held, unless the issue of venue is waived by the defendant." *Baker I* at ¶ 13, citing *Meridy* at ¶ 12. If the state fails to prove that the crime alleged in the indictment occurred in the county where the indictment was returned, a conviction will not stand. *Hampton,* 2012-Ohio-5688 at ¶ 19.

{¶ 16} The standard for establishing venue is whether the defendant has a "significant nexus" with the county where the trial was held. *State v. Mielke*, 12th Dist. Warren No. CA2012-08-079, 2013-Ohio-1612, ¶ 14, citing *State v. Stone*, 12th Dist. Warren No. CA2007-11-132, 2008-Ohio-5671, ¶ 16. As a result, and pursuant to Ohio's venue statute, "[t]he trial of a criminal case in this state shall be held in a court having jurisdiction of the subject matter, and in the territory of which the offense or any element of the offense was committed." R.C. 2901.12(A).

{¶ 17} Ohio's venue statute further provides that when an offender commits offenses in different jurisdictions as part of a course of criminal conduct, venue lies for all the offenses in any jurisdiction in which the offender committed one of the offenses or any element thereof. R.C. 2901.12(H). Offenses "committed as part of the same transaction or chain of events, or in furtherance of the same purpose or objective" serve as "prima facie evidence of a course of criminal conduct." R.C. 2901.12(H)(3).

{¶ 18} With respect to this case, the state alleged that Warren County was the proper venue because Honeycutt, in violation of R.C. 2923.32(A)(1), engaged in a pattern of corrupt activity within Warren County. If the state proved proper venue within the context of Ohio's engaging in a pattern of corrupt activity statute, then venue for all charged offenses would be established pursuant to R.C. 2901.12(H).

{¶ 19} R.C. 2923.32(A)(1) provides that "[n]o person employed by, or associated with,

any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity or the collection of an unlawful debt."[1] An "enterprise" includes "any individual, sole proprietorship, partnership, limited partnership, corporation, trust, union, government agency, or other legal entity, or any organization, association, or group of persons associated in fact although not a legal entity." R.C. 2923.31(C). Further, an enterprise "includes illicit as well as licit enterprises." *Id.* A "pattern of corrupt activity" is defined as "two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event." R.C. 2923.31(E).

{¶ 20} In analyzing whether an associated-in-fact enterprise exists, Honeycutt, in his fourth assignment of error, urges this court to depart from our precedent in which this court rejected the use of the three-part test set forth in *United States v. Riccobene*, 709 F.2d 214 (3rd Cir.1983), for examining Ohio's engaging in a pattern of corrupt activity statute. *See State v. Dodson*, 12th Dist. Butler No. CA2010-08-191, 2011-Ohio-6222; *State v. Baker*, 12th Dist. Warren CA2011-08-088, 2012-Ohio-887 (hereafter, *Baker II*).[2] The same argument was made and expressly rejected in *Baker I*. 2013-Ohio-2398 at ¶ 16. For the reasons set forth in *Baker I*, we deny Honeycutt's request to adopt the three-part test suggested in *Riccobene* and also deny Honeycutt's request that we overrule our precedent in *Dodson* and

---

1. Ohio's engaging in a pattern of corrupt activity statute, R.C. 2323.32, is similar to the federal Racketeer Influenced and Corrupt Organizations Act (RICO), which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of an unlawful debt." 18 U.S.C. 1962(c).

2. In *Riccobene*, the Third Circuit recognized a three-part test for determining the existence of an "illegal enterprise" for RICO purposes. The court determined that there must be (1) evidence of an ongoing organization, formal or informal, (2) evidence that the various associates function as a continuing unit, and (3) evidence that the enterprise has an existence separate and apart from the pattern of criminal activity in which it engages. 709 F.2d at 221-222. As discussed above, this court expressly rejected application of the three-part test *Dodson*, 2011-Ohio-6222, *Baker II*, 2012-Ohio-887, and *Baker I*, 2013-Ohio-2398.

*Baker II. Id.* Honeycutt's fourth assignment of error is, therefore, overruled. The issue of whether Honeycutt engaged in a pattern of corrupt activity in Warren County will be addressed using the law established in *Dodson*, *Baker II*, and *Baker I.*

{¶ 21} Pursuant to *Baker II*, in determining whether a group of people are associated-in-fact, a court will look to whether the group is a "continuing unit that functions with a common purpose." *Baker II* at ¶ 10, quoting *Boyle v. United States*, 556 U.S. 938, 939, 129 S.Ct. 2237 (2009).[3] In addition, an association-in-fact must have three structural features: "'a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit the associates to pursue the enterprise's purpose.'" *Baker I*, 2013-Ohio-2398 at ¶ 19, quoting *Boyle* at 946.[4] When discussing the "structure" requirement, we have previously held that "the term 'structure' means '[t]he way in which parts are arranged or put together *to form a whole*' and '[t]he interrelation or arrangement of parts in a complex entity.'" (Emphasis added). *Baker I* at ¶ 20, quoting *Boyle* at 945-946. An "association-in-fact enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct'" and the "concept of 'association' requires both interpersonal relationships and a common interest." *Boyle* at 946, citing *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524 (1981). "Moreover, the 'defendants must have conducted or participated in the conduct of the *enterprise's* affairs, not just their *own* affairs.'" (Emphasis sic.) *Baker I*, 2013-Ohio-2398 at ¶ 20, quoting *Ouwinga v. Benistar 419 Plan Services, Inc.*, 694 F.3d 783,

---

3. As we have previously held, "[b]ecause the Ohio statute is based upon the federal RICO statute, Ohio Courts [may] rely upon federal case law when analyzing issues pertinent to engaging in a pattern of corrupt activity." *Baker I* at ¶ 19, fn. 1, citing *State v. Schlosser*, 79 Ohio St.3d 329, 332 (1997).

4. In *Boyle*, the United States Supreme Court was asked to determine whether an association-in-fact enterprise "must have 'an ascertainable structure beyond that inherent in the pattern of racketeering activity in which it engages.'" *Boyle*, 940-941. This issue referenced the third component in the three-part test adopted in *Riccobene.* As we recognized in *Dodson* and *Baker II*, the United States Supreme Court rejected the argument that an association-in-fact enterprise must contain an ascertainable structure beyond that inherent in the pattern of racketeering activity in which it engages. *See Boyle* at 945-948. Instead, the Supreme Court in *Boyle* reiterated that "proof of a pattern of racketeering activity may be sufficient in a particular case to permit a jury to infer the existence of an association-in-fact enterprise." *Id.* at 951.

792 (6th Cir.2012).

{¶ 22} By indicting Honeycutt on a charge of engaging in a pattern of corrupt activity in violation of R.C. 2923.32(A)(1), the state alleged that Honeycutt directly or indirectly conducted or participated in a corrupt activity with a group of persons associated-in-fact to traffic marijuana in Warren County. In support of its claim, the state produced evidence that Honeycutt and Baker cultivated marijuana in the Creek Road warehouse, that Baker sold marijuana to the Lampes, that the Lampes sold marijuana to Lopez, that Lopez sold marijuana to Pagenstecher, and that Pagenstecher sold marijuana to minors and an undercover officer in Warren County.[5] According to the state, an element of engaging in a pattern of corrupt activity occurred when Pagenstecher sold marijuana in Warren County, thereby providing venue in Warren County. *See* R.C. 2901.12(H). However, the state failed to prove beyond a reasonable doubt that Honeycutt was a direct or indirect participant in the corrupt activity of a group of persons associated-in-fact conducting the affairs of an enterprise in Warren County.

{¶ 23} Even when broadly construing the language of R.C. 2923.32, the record demonstrates that the state failed to prove there was a structure that revealed Honeycutt acting together with others for the sale of marijuana in Warren County. Although the state adequately demonstrated that Honeycutt and Baker were partners in the cultivation and trafficking of the marijuana grown at the warehouse location in Blue Ash, Hamilton County, Ohio, the state failed to demonstrate that Honeycutt and Baker formed an enterprise with

---

5. There was conflicting evidence presented at trial as to whether Lopez, prior to the January 13, 2012 arranged drug-buy at the Walmart in Warren County, ever sold drugs to Pagenstecher in Warren County. Pagenstecher's testimony indicated that Lopez had previously sold marijuana to him at the Walmart location in Warren County, but Lopez expressly denied having made any sales in Warren County except for the transaction that occurred on the date he was arrested. Regardless of whether Lopez, in addition to Pagenstecher, trafficked in marijuana in Warren County, the evidence presented by the state was insufficient to establish that Honeycutt was a direct or indirect participant in the corrupt activity of a group of persons associated-in-fact conducting the affairs of an enterprise in Warren County.

others (i.e., Lopez or Pagenstecher) for the trafficking of marijuana in Warren County. As in *Baker I,* the problem in this case is that the state failed to present evidence of a common purpose or of relationships among the associates to form a whole, as contemplated by the *Boyle* court. See *Baker I* at ¶ 21. There was no indication that Pagenstecher or Lopez, the only two individuals who acted within Warren County, conducted or participated in conduct that pertained to Honeycutt's enterprise, rather than their own affairs. Moreover, contrary to the state's argument, the fact that each individual involved made money selling marijuana and is guilty of associating with others who buy or sell marijuana does not mean that they acted as a "continuing unit that functions with a common purpose." To hold otherwise "would transcend the remedial purpose of R.C. 2923.32." *Id.*

{¶ 24} While the state argued that the group's purpose was to make money, the state did not present evidence that Honeycutt, the Lampes, Lopez, and Pagenstecher formed an entity to earn money as an enterprise. Rather, the evidence presented at trial revealed that each individual had his own separate and distinct "business" venture when selling marijuana and that each individual participated in his own affairs. There is no evidence in the record that any of any of these individuals had any involvement in the others' business affairs, such as setting prices, being assigned to certain customers, or being told to sell (or avoid selling) in certain territories. Furthermore, there is no evidence that Honeycutt, the Lampes, Pagenstecher or Lopez joined together to make money *for the same enterprise.* There is no conduct, conspiracy, or element of control attributed to Honeycutt placing his enterprise or any of his associates in Warren County.

{¶ 25} Pagenstecher testified his only dealing with Lopez was for the purchase of the marijuana. Once he purchased the marijuana, no one, including Lopez tried to "dictate or * * * control where [Pagenstecher] was * * * to sell." Pagenstecher testified that Lopez "didn't try to get [into his] business" and he, likewise, did not try to get into Lopez's business. Similarly,

Lopez testified that he was not "in business" with the Lampes as they did not tell him to whom, where, or when to sell the marijuana he purchased from them. In Lopez's words, his business and the Lampes' business "[were] all separate."

{¶ 26} The Lampes' testimony corroborated Lopez's testimony. Stacy Lampe testified that she and her husband did not "participate" in Lopez's business. She stated that neither she nor her husband told Lopez "where to sell," "how much to charge," or "when to sell" the marijuana, and that they sold their marijuana to other people besides Lopez. Cody Lampe testified that his marijuana cultivation could yield approximately seven to ten pounds every few months, that Lopez only purchased a fraction of this amount (around two pounds a month), and that sales were regularly made to at least two or three other individuals. The Lampes clearly relied on selling marijuana to other clients besides Lopez, and there is no indication that the Lampes were interested in any enterprise but their own. In short, the record is devoid of evidence demonstrating that the parties acted jointly for the same enterprise with a common purpose attendant to that enterprise.

{¶ 27} The record also demonstrates that the state failed to establish that the parties had relationships with one another sufficient to establish an enterprise. Neither Baker nor Honeycutt had any relationship with Lopez or Pagenstecher, the supposed participants in Honeycutt's enterprise. Nor did Pagenstecher have a relationship with the Lampes. The testimony elicited at trial revealed that only the Lampes were associated with Baker, who in turn had a relationship with Honeycutt. Neither Lopez nor Pagenstecher knew about Baker or Honeycutt, or that Honeycutt's enterprise existed. Pagenstecher testified that he had never heard of or met the Lampes, Baker, or Honeycutt prior to being arrested. Pagenstecher's only contact for marijuana was Lopez, and he did not know where Lopez got the marijuana Lopez sold.

{¶ 28} Lopez, in turn, testified that although he purchased his marijuana from the

Lampes, he had no knowledge about where the Lampes procured the marijuana they sold to him. Lopez testified that anytime he purchased marijuana from the Lampes, the marijuana came prepackaged from the Lampes' basement. The state failed to present evidence demonstrating that anyone else, including Baker or Honeycutt, had any involvement in Lopez's business, or that Lopez had a common purpose with Honeycutt in the cultivation and harvesting of marijuana. Lopez testified that he had no knowledge about or contact with Baker or Honeycutt.[6]

{¶ 29} The Lampes both testified that they sold around two pounds of marijuana a month to Lopez, and that Lopez would pick up the drugs from their home in Hamilton County. According to Stacy Lampe, the amount of marijuana that she and her husband grew was "more than enough" to meet Lopez's demand for the drug. However, when it was necessary to supplement their personal grow, the Lampes would purchase marijuana from Baker. Cody Lampe testified that he stored the marijuana he grew in the same location he stored the marijuana purchased from Baker, and there were times when some of Baker's marijuana was sold to Lopez.[7] Baker, however, did not control the Lampes' ability to sell to Lopez or anyone

---

6. The state argues, and we agree, that members of an enterprise "need not know the identity, or even the number, of his confederates." *State v. Siferd*, 141 Ohio App.3d 103, 2002-Ohio-6801, ¶ 43 (3d Dist.). *See also Baker I*, 2013-Ohio-2398, ¶ 26, fn. 4. Even so, the state has to prove the members were "*voluntarily connected* to the pattern of corrupt activity compromising the enterprise." (Emphasis sic.) *Siferd* at ¶ 43. The fact that neither Pagenstecher nor Lopez knew of Honeycutt's existence is but one factor we considered when determining whether their participation in the alleged enterprise was a voluntary connection to or an association with Honeycutt.

7. **{¶ a}** Unlike *Baker I*, the evidence presented by the state in the case sub judice demonstrated that some of the marijuana Baker sold to the Lampes was resold to Lopez. However, for the reasons discussed above, the fact that marijuana can be traced from Baker, to the Lampes, and then to Lopez does not establish an enterprise. *See Baker I* at ¶ 29.

**{¶ b}** Furthermore, the fact that the drugs the Lampes sold to Lopez can be traced back to Baker does not mean that the drugs originated out of an enterprise comprised of Baker and Honeycutt. Trial testimony established that Baker had other grow locations in addition to the Creek Road warehouse, including the grow house on Noble Avenue in Hamilton, Ohio. There is no evidence in the record tying Honeycutt to these other grow operations. There is also no evidence demonstrating that the marijuana Baker sold to the Lampes, which was later sold to Lopez, was marijuana cultivated at the Creek Road warehouse, the only location tying Honeycutt directly to Baker.

else, nor did Baker direct the Lampes on when or where the drugs could be sold. Similarly, the Lampes did not direct or have knowledge of to whom, where, or when Lopez sold the drugs Lopez purchased from them. The state, therefore, did not prove that the parties functioned as separate parts to form a whole, with a shared, common purpose that Honeycutt engage in the sale of marijuana in Warren County.

{¶ 30} The record indicates that Baker, the Lampes, Lopez, and Pagenstecher each committed crimes by selling marijuana at some given point in time. The parties engaged in a series of drug transactions that can be described as a "chain." However, "the finding of 'enterprise' demands more than merely grouping related or successive crimes together" and more "than individual criminals coming into contact." *Baker I*, 2013-Ohio-2398 at ¶ 28, fn. 6 and ¶ 29. In this case, a finding of "enterprise" would have required the state to prove that Lopez and Pagenstecher voluntarily participated in, or were in fact, associated with organized conduct for the purpose or goals of an enterprise existing between Honeycutt, Baker and the Lampes.[8] Neither Lopez nor Pagenstecher did anything to further Honeycutt's enterprise. Rather, they sold marijuana only in furtherance of their own personal gain.

{¶ 31} The evidence presented at trial demonstrated that Honeycutt's enterprise never touched Warren County. Rather, all of Honeycutt's cultivation, preparation, and sale of marijuana occurred at locations in Hamilton and Butler Counties. Even assuming that the marijuana Baker sold to the Lampes was grown in the Creek Road Warehouse rather than at one of Baker's other grow locations, where there is no evidence tying Honeycutt to the operation, the evidence demonstrated that Baker only sold the marijuana in Butler or

---

8. As we noted in *Baker I*, there is little doubt that Baker and the Lampes participated in each other's enterprises. In *Baker I* and in the case sub judice, the state presented evidence demonstrating that Cody Lampe and Baker exchanged tips on the cultivation and harvesting of marijuana and the two would share "cloned" plants with one another. However, as we held in *Baker I*, "[t]he continuing parts * * * must function as a whole" and here, as in *Baker I*, neither Pagenstecher nor Lopez were a "continuing part" in Honeycutt's enterprise. *Baker I* at ¶ 28, fn. 7, citing *Boyle*, 556 U.S. 938.

Hamilton counties. *See* fn. 7 above. Neither Baker nor Honeycutt ever accepted drug shipments or sold their product in Warren County. Further, neither Baker nor Honeycutt ever directed or steered their associates to further Honeycutt's enterprise in Warren County.

{¶ 32} The state, therefore, failed to prove that Honeycutt engaged in a pattern of corrupt activity because there was no evidence that Honeycutt was involved in an association-in-fact enterprise with Lopez or Pagenstecher. While it is abundantly clear that Honeycutt, by himself or through his associate, Baker, engaged in a pattern of corrupt activity in Butler and Hamilton Counties, no element of this offense occurred in Warren County. The state has failed to prove venue beyond a reasonable doubt and an acquittal must be entered upon the record. *See Hampton*, 2012-Ohio-5688 at ¶ 24; *Baker I* at ¶ 38.

{¶ 33} Having found that the state failed to prove that Warren County was the proper venue, we sustain Honeycutt's first assignment of error. Honeycutt's convictions are reversed and vacated, and double jeopardy attaches to bar the state from reprosecuting these charges. *See Baker I* at ¶ 39.

{¶ 34} Assignment of Error No. 2:

{¶ 35} THE EVIDENCE IS INSUFFICIENT TO ESTABLISH ONE OR MORE INCIDENTS OF CORRUPT ACTIVITY BEYOND A REASONABLE DOUBT.

{¶ 36} Assignment of Error No. 3:

{¶ 37} THE EVIDENCE IS INSUFFICIENT TO ESTABLISH BEYOND A REASONABLE DOUBT HONEYCUTT IS GUILTY OF CULTIVATING MORE THAN 20,000 GRAMS OF MARIJUANA.

{¶ 38} In his second assignment of error, Honeycutt argues that the state failed to prove he engaged in more than one incident of corrupt activity, and, as such, his conviction for engaging in a pattern of corrupt activity was improper. In his third assignment of error, Honeycutt argues the trier of fact erred by convicting him of cultivating more than 20,000

grams of marijuana because the state failed to weigh the marijuana once it was dried and separated from the stalk.

{¶ 39} Given our disposition of Honeycutt's first assignment of error, it is unnecessary to reach the merits of his second and third assignments of error. The assignments of error are, therefore, moot. *See* App.R. 12(A)(1)(c).

### III. CONCLUSION

{¶ 40} Judgment reversed, Honeycutt's convictions are vacated, and Honeycutt is hereby discharged.

S. POWELL and M. POWELL, JJ., concur.